**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| KARA TONEY, SHANEQUA REED and NATHAN CUSTALOW-HALL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RICHMOND BEHAVIORAL HEALTH AUTHORITY,<br><br>Defendant. | Civil Action No. 3:26-cv-00001-DJN<br><br>**JURY TRIAL DEMANDED** |

# FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Kara Toney, Shanequa Reed and Nathan Custalow-Hall ("Plaintiffs") bring this First Amended Class Action Complaint on behalf of themselves, and all others similarly situated, against Defendant Richmond Behavioral Health Authority ("RBHA" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except the allegations as to their own actions, which are based on personal knowledge:

## NATURE OF THE CASE

1. Plaintiffs bring this class action against RBHA for its failure to properly secure and safeguard Plaintiffs' and other similarly situated current and former patients' ("Class Members") sensitive information, including names, Social Security numbers, passport numbers, and financial

account information (collectively personally identifiable information ("PII")).[1]

2. In addition, Plaintiffs also bring this class action against RBHA for its failure to properly secure and safeguard Plaintiffs' and Class Members' protected health information ("PHI") including health information.[2]

3. PII and PHI are collectively referred to as "Private Information."

4. Richmond Behavioral Health Authority is a public behavioral health agency that provides mental health and addiction treatment services. According to its website, "RBHA is the statutorily established public entity responsible for providing mental health, intellectual disabilities, substance abuse and prevention services to the citizens of the City of Richmond."[3]

5. Plaintiffs and Class Members are required to provide Defendant with their Private Information and/or the Private Information of their family members as a prerequisite for receiving services from Defendant. Because of this, RBHA has a duty to secure, maintain, protect, and safeguard the Private Information that it collects and stores against unauthorized access and disclosure through reasonable and adequate data security measures.

6. Despite RBHA's duty to safeguard Private Information, Plaintiffs and Class Members' Private Information was compromised and ***stolen*** in a data breach when, on or about September 30, 2025, Defendant "became aware that it was the victim of a data incident" (the "Data

---

[1] *See* RBHA – Data Security Incident Notice. https://www.rbha.org/resources/docs/Data%20Security%20Website%20Notice.pdf (last visited March 5, 2026March 5, 2026).

[2] *Id.*

[3] https://www.rbha.org/ (last visited March 5, 2026).

Breach").[4] Unfortunately, as a result of the Data Breach, Plaintiffs' and Class Members' Private Information was stolen and posted on the dark web.

7. The Data Breach occurred in part because RBHA stored Plaintiffs' and Class Members' Private Information in an unencrypted, Internet-accessible environment.

8. After RBHA discovered the Data Breach in September 2025, it conducted an investigation which concluded "that malicious actors gained access to RBHA's network on or about September 29, 2025, and deployed ransomware to encrypt portions of the network."[5]

9. Despite learning about the breach on or about September 30, 2025, RBHA waited until on or about December 4, 2025 to begin notifying impacted individuals of the unauthorized access.[6]

10. Based on publicly available information, the Private Information stolen in the Data Breach includes a wide swath of highly sensitive information belonging to RBHA's current and former patients, as well as certain of their family members, including their names, Social Security number, passport number, financial account information and health information.[7]

11. The Private Information was acquired by cyber-criminals who perpetrated the attack and remains in the hands of those cyber-criminals who have published, at least in part, the information on the Dark Web. According to Defendant's report to the Health and Human Services Office of Civil Rights, a total of 113,232 individuals were affected. [8]

---

[4] *See* RBHA – Data Security Incident Notice. https://www.rbha.org/resources/docs/Data%20Security%20Website%20Notice.pdf (last visited March 5, 2026).

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] HHS Office for Civil Rights, Cases Currently Under Investigation, *supra* note 1.

12. Upon information and belief, cybercriminals were able to breach Defendant's systems because Defendant breached its duties and obligations in one or more of the following ways: (i) failing to design or being negligent in the design, implementation, monitoring, and maintaining reasonable network safeguards against foreseeable threats; (ii) failing to design, implement, and maintain reasonable data retention policies; (iii) failing to adequately train staff on data security; (iv) failing to comply with industry-standard data security practices; (v) failing to warn Plaintiffs and Class Members of Defendant's inadequate data security practices; (vi) failing to encrypt or adequately encrypt the Private Information; (vii) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (viii) failing to utilize widely available software able to detect and prevent this type of attack; and (iv) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents. These failures rendered RBHA an easy target for cybercriminals.

13. Plaintiffs and the Class Members are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiffs and members of the proposed Class trusted Defendant with their Private Information, but Defendant betrayed that trust. Defendant failed to properly use reasonable industry standard security practices to prevent the Data Breach.

14. As a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiffs' and Class Members' Private Information was stolen and is now in the hands of and exposed to cybercriminals.

15. Due to the theft of their Private Information, including their Social Security numbers, Plaintiffs and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, intrusion of their health privacy, and similar forms of

criminal mischief, risk which may last for the rest of their lives. Consequently, Plaintiffs and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

16. Plaintiffs, on behalf of themselves and all others similarly situated, allege claims for negligence, breach of implied contract, unjust enrichment and declaratory judgment arising from the Data Breach. Plaintiffs seek damages and injunctive relief, including the adoption reasonably sufficient practices to safeguard the Private Information in Defendant's custody to prevent incidents like the Data Breach from reoccurring in the future, and for Defendant to provide identity theft protective services to Plaintiffs and Class Members for their lifetimes.

## PARTIES

17. Plaintiff Kara Toney is an adult, who at all relevant times, was a resident and citizen of the State of North Carolina. Plaintiff Toney received a data breach notice informing her that her Private Information provided to RBHA was compromised during the Data Breach.

18. Plaintiff Shanequa Reed is an adult, who at all relevant times, was a resident and citizen of the State of Virginia. Plaintiff Reed received a data breach notice informing her that her Private Information provided to RBHA was compromised during the Data Breach.

19. Plaintiff Nathan Custalow-Hall is an adult, who at all relevant times, was a resident and citizen of the State of Ohio. Plaintiff Custalow-Hall received a data breach notice informing him that his Private Information provided to RBHA was compromised during the Data Breach.

20. Plaintiffs have suffered actual injury from having their Private Information exposed and/or stolen as a result of the Data Breach, including: (a) required mitigation efforts, including researching the Data Breach and needing to monitor their financial statements to ensure their information is not used for identity theft and fraud; (b) damages to and diminution of the value of

their Private Information, a form of intangible property that loses value when it falls into the hands of criminals; (c) loss of privacy; (d) nominal damages; and (d) continuous imminent and impending injury raising from increased risk of financial identity theft and fraud.

21. As a direct and proximate result of the Data Breach, Plaintiffs has also received a significant increase in spam calls since the Data Breach. Plaintiffs noticed that this was a considerable increase from the amount of spam calls she received before the Data Breach.

22. As a result of the Data Breach, Plaintiffs will continue to be at a substantial and certainly impending risk for fraud and identity theft, and their attendant damages, for years to come.

23. Defendant Richmond Behavioral Health Authority is an independent quasi-government entity, with its principal executive office located at 107 South 5th Street, Richmond, Virginia 23219.

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendant.

25. This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

26. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

## FACTUAL BACKGROUND

27. Defendant is a public agency that serves residents of the City of Richmond, Virginia by providing community-based mental health, substance use, and related support services to individuals and families in need.

28. Plaintiffs and Class Members are and/or were patients (or family members thereof) of Defendant.

29. As a condition of obtaining services from Defendant, Plaintiffs and Class Members directly or indirectly entrusted RBHA with their sensitive Private Information. Indeed, absent obtaining Plaintiffs' and Class Members' Private Information, Defendant would not be able to provide mental health, substance abuse, and related services.

30. Plaintiffs and Class Members value the confidentiality of their Private Information and, accordingly, have taken reasonable steps to maintain the confidentiality of their Private Information.

31. In turning over their Private Information, Plaintiffs and Class Members reasonably expected that their provider would safeguard their highly sensitive information.

32. By obtaining, collecting, and storing Plaintiffs' and Class Members' Private Information, RBHA assumed equitable and legal duties to safeguard Plaintiffs' and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

33. Despite these duties, RBHA failed to implement reasonable data security measures to protect Plaintiffs' and Class Members' Private Information and ultimately allowed threat actors to breach its computer systems and exfiltrate Plaintiffs' and Class Members' Private Information.

**THE VALUE OF PRIVATE INFORMATION AND EFFECTS OF UNAUTHORIZED DISCLOSURE**

34. RBHA understood that the Private Information it collects was highly sensitive and of significant value to those who would use it for wrongful purposes.

35. RBHA also knew that a breach of its computer systems, and exposure of the Private Information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised and stolen.

36. These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

37. Private Information has considerable value and constitutes an enticing and well-known target for hackers. Hackers can easily sell stolen data as there has been "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[9]

38. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[10]

39. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches,

---

[9] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last accessed March 5, 2026).

[10] https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed March 5, 2026).

exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[11]

40. Indeed, a 2022 poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[12]

41. More recently, in 2025 alone, 3,322 data breaches were recorded, 534 of which occurred in the medical or healthcare sector.[13] The 534 reported breaches reported in 2025 resulted in around 33,000,000 victim notices being sent out to affected individuals.[14]

42. In 2024, healthcare facilities suffered the "highest combined total of ransomware and data theft attacks of any U.S. critical infrastructure sector."[15] Thus, RBHA knew or should of known that the healthcare sector was particularly susceptible to data breach, such as the Data Breach that resulted in the theft of Plaintiffs' and Class Members' Private Information.

---

[11] *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/ (last accessed March 5, 2026).

[12] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last accessed March 5, 2026).

[13] 2025 Data Breach Annual Report (ITRC, Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf. (last accessed February 27, 2026).

[14] *Id.*

[15] Jon Riggi, *Report: Health care had most reported cyberthreats in 2024*, American Hospital Association (May 2025), *available at:* https://www.aha.org/news/headline/2025-05-12-report-health-care-had-most-reported-cyberthreats-2024? (last visited: March 4, 2026).

43. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[16]

44. The ramifications of RBHA's failure to keep Plaintiffs' and Class Members' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[17]

45. Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

---

[16] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20, (last accessed March 5, 2026).

[17] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf, (last accessed March 5, 2026).

46. The specific types of personal data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiffs and other Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

47. **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security Numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

48. Indeed, the Social Security Administration warns that the process of replacing a Social Security is a difficult one that creates other types of problems, and that it will not be a complete remedy for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[18]

---

[18] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed March 5, 2026).

49. Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

50. **Passport Numbers**—As explained by Aura, a leading identity theft protection service, "[p]assports are among the most widely accepted forms of identification, making them prime targets for scammers and fraudsters. If scammers steal your passport number, they can impersonate you, create fake travel documents, or even open bank accounts in your name."[19] Indeed, when combined with other PII, such as a name, address, or picture, a "passport number enables scammers to impersonate you, access your online accounts, or target you in sophisticated scams that lead to identity theft."[20]

51. Moreover, "[u]nlike credit card data or personal Social Security numbers, there are few mechanisms in place to alert consumers that their passport numbers have been stolen and possibly used for fraud" making it difficult to determine if criminals are using a forged or fraudulent passport in an individual's name.[21]

52. Based on the value to cybercriminals of the patient PII in its possession, RBHA knew or should have known the importance of safeguarding the PII entrusted to it and of the

---

[19] Yaniv Masjedi, *What Can Scammers Do With Your Passport Number*?, Aura (Apr. 12, 2023), https://www.aura.com/learn/what-can-someone-do-with-your-passport-number#:~:text=If%20scammers%20steal%20your%20passport,could%20still%20be%20at%20risk.

[20] *Id.*

[21] Kate Fazzini, *Here's how criminals use stolen passport information*, CNBC (July 5, 2019), https://www.cnbc.com/2019/07/05/how-criminals-use-stolen-passport-information.html.

foreseeable consequences if its data security systems were breached. RBHA failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**RBHA BREACHED ITS DUTY TO PROTECT PATIENTS' PRIVATE INFORMATION**

53. On or about September 30, 2025, RBHA became aware of the Data Breach.[22]

54. After becoming aware of the Data Breach, RBHA launched an investigation into, which concluded that threat actors gained unauthorized access to RBHA's network on or about September 29, 2025.[23] According to Defendant, the threat actors deployed ransomware to encrypt its network.[24]

55. According to recent news reports, during the Data Breach, a threat actor gained access to its systems without authorization and obtained certain personal information of current and former patients of RBHA.[25]

56. The patient information compromised during the Data Breach includes, at the very least, personal information provided to RBHA including names, passport numbers, Social Security numbers, financial account information, and health information.[26]

57. On or around November 28, 2025, nearly two months after the Data Breach began, RBHA reported the Data Breach to the U.S. Department of Health and Human Services, indicating the Data Breach compromised the Private Information of 113,232 individuals.[27]

---

[22] *See* RBHA – Data Security Incident Notice. https://www.rbha.org/resources/docs/Data%20Security%20Website%20Notice.pdf (last visited March 5, 2026).
[23] *Id.*
[24] *Id.*
[25] https://www.hipaajournal.com/richmond-behavioral-health-authority-data-breach/ (last visited March 5, 2026).
[26] *Id.*
[27] *See* HHS OCR – Breach Portal. https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited March 5, 2026).

58. Defendant has obfuscated the details of the Data Breach, omitting from its Data Breach Notice who perpetrated the Data Breach, why it took Defendant so long to notify impacted customers, and other key details.

59. After RBHA discovered the malicious actor on its systems, the notorious ransomware gang Qilin claimed responsibility by adding RBHA to its Tor-based website in mid-October 2025.[28]




[29]

60. Qilin has wasted no time exploiting the Private Information stolen in the Data Breach and has already published 192 gigabytes of stolen data (over 393,000 files) from the data stolen from RBHA.[30] Qilin is a known, Russian-speaking cybercrime organization that has been discovered and/or active since at least August 2022.[31]

---

[28] https://www.securityweek.com/113000-impacted-by-data-breach-at-virginia-mental-health-authority/ (last viewed March 5, 2026).

[29] https://www.ransomware.live/id/UmljaG1vbmQgQmVoYXZpb3JhbCBIZWFsdGggQXV0aG9yaXR5QHFpbGlu (last viewed March 5, 2026).

[30] *Id.*

[31] https://en.wikipedia.org/wiki/Qilin_(cybercrime_group) (last viewed March 5, 2026).

61. On information and belief, based on the nature of the cyberattack, Plaintiffs' and the proposed Class Members' Private Information was stolen and unauthorizedly disclosed to third-party cybercriminals in the Data Breach (Qilin), and has been posted to the Dark Web for public viewing and use, in the public domain, to be sold and utilized for fraudulent and criminal misuse. Unfortunately, "once [Qilin] gain[s] access to a network, they ***steal*** sensitive data, disrupt systems, and ***publish*** stolen information if victims refuse to pay." (emphasis added).[32] Qilin's publication of Plaintiffs' and Class Members' Private Information on the dark web is a devastating development that places Plaintiffs and Class Members at imminent risk of identity theft.

62. As set forth below, despite this threat, and other known threats, upon information and belief, RBHA failed to take any action to increase security of the Private Information it held and knew to be highly valuable to cybercriminals.

63. On or around the time RBHA notified the U.S. Department of Health and Human Services of the Data Breach, Plaintiffs received a notice informing her that their Private Information had been compromised during the Data Breach.

64. Upon information and belief, Class Members received similar notices informing them that their Private Information was compromised during the Data Breach.

65. The Data Breach occurred as a direct result of RBHA's failure to implement and follow basic security procedures to protect its current and former patients' Private Information that it had collected and stored.

---

[32] https://www.cybereason.com/blog/threat-alert-qilin-seizes-control (last viewed March 6, 2026).

**RBHA FAILED TO COMPLY WITH FTC GUIDELINES**

66. RBHA is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

67. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[33]

68. Among other guidance, the FTC recommends the following cybersecurity guidelines for businesses in order to protect sensitive information in their systems: [34]

a. Identify all connections to the computers where sensitive information is stored;

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

---

[33] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed December 29, 2023).

[34] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed March 5, 2026).

e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

69. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[35]

70. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an

[35] *Id.*

unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

71. RBHA failed to properly implement basic data security practices. RBHA's failure to employ reasonable and appropriate measures to protect against unauthorized access to its patients' PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

72. RBHA was at all times fully aware of its obligations to protect the PII of its patients given the reams of PII that it had access to as Plaintiffs and the Class Members' provider. RBHA was also aware of the significant repercussions that would result from a failure to properly secure the Private Information it maintained.

73. Despite recognizing its duty to do so, on information and belief, Defendant has not implemented reasonable cybersecurity safeguards or policies to protect Private Information in its possession or adequately trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to Plaintiffs' and Class Members' Private Information.

**RBHA FAILED TO PREVENT, IDENTIFY, AND TIMELY REPORT THE DATA BREACH**

74. RBHA admits that an unauthorized third-party accessed its information technology system and deployed ransomware to encrypt its systems.[36]

75. RBHA failed to take necessary precautions or employ adequate measures necessary to protect its computer systems against unauthorized access and keep Plaintiffs and Class Members' Private Information secure.

[36] https://www.rbha.org/resources/docs/Data%20Security%20Website%20Notice.pdf (last visited March 5, 2026).

76. The Private Information that RBHA allowed to be accessed and exfiltrated in the Data Breach is the type of private information that RBHA knew or should have known would be the target of cyberattacks.

77. Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[37] RBHA failed to disclose that its systems and security practices were inadequate to reasonably safeguard individuals' Private Information.

78. The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[38] Immediate notification to individuals impacted by a data breach is critical so that those impacted can take measures to protect themselves.

**The Data Breach's Inclusion of PHI is Particularly Significant**

79. With respect to the data breaches implicating PHI, a study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[39]

80. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[40]

---

[37] Protecting Personal Information: A Guide for Business, Fed. Trade Comm'n (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited March 5, 2026).
[38] *Id.*
[39] https://distilgovhealth.com/2019/10/03/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud/ (last visited March 5, 2026).
[40] *Id.*

81. The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[41]

82. Health information in particular is likely to be used in detrimental ways - by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[42]

83. As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals - they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to - we've even seen $60 or $70."[43]

84. The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can sell for up to $1,000 online . . ."[44]

85. Cybercriminals sell health information at a far higher premium than stand-alone PII. This is because health information enables thieves to go beyond traditional identity theft and obtain medical treatments, purchase prescription drugs, submit false bills to insurance companies, or even undergo surgery under a false identity. The shelf life for this information is also much longer—while individuals can update their credit card numbers, they are less likely to change their health insurance information. When medical identity theft occurs, the associated costs to victims

---

[41] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited March 5, 2026).
[42] *Id.*
[43] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited March 5, 2026).
[44] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited March 5, 2026).

can be exorbitant. According to a 2015 study, at least 65% of medical identity theft victims had to "pay an average of $13,500 to resolve the crime."[45]

86. As noted above, some of the information that was compromised in the Data Breach included, among other things, "health information."[46] Accordingly, Plaintiffs and Class Members must remain especially vigilant given the highly sensitive nature of the PHI at issue in this Data Breach.

**RBHA FAILED TO COMPLY WITH HIPAA'S MANDATES**

87. Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

88. In addition, RBHA is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

89. HIPAA's Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information, while HIPAA's Security Standards for the Protection of Electronic Protected Health Information establishes national security standards for health information that is stored or transmitted electronically.

---

[45] Justin Klawans, What is medical identity theft and how can you avoid it?, The Week (Aug. 2, 2023), https://theweek.com/feature/briefing/1025328/medical-identity-theft-how-to-avoid.
[46] *See* RBHA – Data Security Incident Notice. https://www.rbha.org/resources/docs/Data%20Security%20Website%20Notice.pdf (last visited March 5, 2026).

90. HIPAA requires "comply[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. Such health information includes "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

91. HIPAA's Security Rule requires entities such as RBHA to, *inter alia*, do the following: (i) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (ii) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (iii) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (iv) ensure compliance by its workforce.

92. HIPAA also requires entities such as RBHA to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, RBHA is required under HIPAA to "[i]implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

93. Moreover, both HIPAA and HITECH required RBHA to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

94. Finally, HIPAA requires an entity to provide notice of a data breach to affected individuals "without unreasonable delay and in no case later than 60 days following discovery of the breach." 45 C.F.R. §§ 164.400-414.

95. RBHA was, at all times, aware of the mandates of HIPAA. Despite being aware of these mandates and its concomitant obligations, RBHA failed to comply with its obligations and protect the PHI of Plaintiffs and the Class Members.

96. Defendant's failure in this regard is especially egregious given that Defendant was fully aware of the breadth and depth of PHI it obtained and stored and the foreseeable consequences that would result from unauthorized disclosure of this information.

**PLAINTIFFS' EXPERIENCES**

***Kara Toney***

97. Plaintiff Kara Toney is an adult, who at all relevant times, was a resident and citizen of the State of North Carolina.

98. Plaintiff Toney received a data breach notice on or about December 4, 2025 informing her that her Private Information provided to RBHA was compromised during the Data Breach

99. Defendant's notice fails to mention the involvement of the criminal ransomware gang Qilin or that Qilin had already published Plaintiffs' and other Class Members' Private Information on its Dark Web website, making the information accessible to other criminals. In fact – the notice letter states the opposite indicating Defendant had no indication the Private Information was misused by an unauthorized individual.[47]

---

[47] *See* RBHA – Data Security Incident Notice. https://www.rbha.org/resources/docs/Data%20Security%20Website%20Notice.pdf (last visited March 5, 2026).

100. Plaintiff Toney provided Defendant with her sensitive PII and PHI as a condition of receiving Defendant's services. She provided Defendant with her full contact information, Social Security Number, government identification, date of birth, medical history and records, other medical information, financial payment information and health insurance information, as well as any other necessary information required by Defendant to provide treatment.

101. Thus, in order to render services to Plaintiff Toney, obtained and maintained Plaintiff Toney's Private Information prior to the Data Breach. As a result, Plaintiff Toney was injured by Defendant's Data Breach.

102. Plaintiff Toney is especially alarmed by the breadth of information involved in the Data Breach. Defendant's letter acknowledges that information such as full name or first initial and last name combined with your Social Security number, passport number, financial account information or health information" was compromised by the Data Breach. But considering the other critical information that was left off the letter or misrepresented, Plaintiff Toney has no confidence that the data stolen by the cybercriminals was limited and conceivably included any data Plaintiff Toney provided to RHBA.

103. Plaintiff Toney provided her Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Toney's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

104. Plaintiff Toney reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of Private Information.

105. Plaintiff Toney is very careful about sharing her sensitive PII and PHI. She has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source. She also stores any documents containing her sensitive information in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

106. Plaintiff Toney has made reasonable efforts to mitigate the effect of the Data Breach, including, but not limited to, researching the Data Breach, incurring costs, monitoring her credit information, and changing passwords on her various accounts.

107. Plaintiff Toney has already spent much time monitoring her account to protect herself and will continue to spend significant time and effort monitoring her accounts to protect herself from identity theft.

108. She fears for her personal financial security and worries about what information was exposed in the Data Breach. She knows that cybercriminals are selling her Private Information, and that her PII or PHI could be abused and re-sold months or even years after a data breach. The damage to her identity will only multiply now that Defendant's inadequate security has led to her information being published on the Dark Web by cybercriminals.

109. Plaintiff Toney would not have provided her Private Information to Defendant had she known that Defendant would not take reasonable steps to safeguard it.

110. Because of Defendant's Data Breach, Plaintiff Toney has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, her injuries are precisely the type of injuries that the law contemplates and addresses.

111. Plaintiff Toney suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

112. Plaintiff Toney suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

113. Plaintiff Toney suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Toney's Private Information right in the hands of criminals.

114. Because of the Data Breach, Plaintiff Toney anticipates spending considerable amounts of time and money to try and mitigate her injuries.

115. Today, Plaintiff Toney has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Shanequa Reed***

116. Plaintiff Shanequa Reed is and at all times mentioned herein was an individual citizen of Virginia, residing in the city of Richmond.

117. Plaintiff Reed provided Defendant with her sensitive PII and PHI as a condition of receiving Defendant's services. She provided Defendant with her full contact information, Social Security Number, government identification, date of birth, medical history and records, other medical information, financial payment information and health insurance information, as well as any other necessary information required by Defendant to provide treatment.

118. Thus, Defendant obtained and maintained Plaintiff Reed's Private Information prior to the Data Breach. As a result, Plaintiff Reed was injured by Defendant's Data Breach.

119. Plaintiff Reed received notice of the Data Breach by mail around December 4, 2025, informing her that her sensitive information was part of Defendant's Data Breach. Defendant's notice fails to mention the involvement of the criminal ransomware gang Qilin or that Qilin had already published Plaintiffs' and other Class Members' Private Information on its Dark Web website, making the information accessible to other criminals. In fact – the notice letter states the opposite indicating Defendant had no indication the Private Information was misused by an unauthorized individual.[48]

120. Plaintiff Reed is especially alarmed by the breadth of information involved in the Data Breach. Defendant's letter acknowledges that information such as full name or first initial and last name combined with your Social Security number, passport number, financial account information or health information" was compromised by the Data Breach. But considering the other critical information that was left off the letter or misrepresented, Plaintiff Reed has no confidence that the data stolen by the cybercriminals was limited and conceivably included any data Plaintiff Reed provided to RHBA.

121. In or around November 2025, only a few weeks after the Data Breach, Plaintiff Reed experienced actual financial fraud when unauthorized charges appeared on her Chime checking account. Specifically, cybercriminals successfully processed three separate fraudulent transactions in the amounts of $100.00, $50.00, and $75.00. Upon discovering this theft, Plaintiff Reed was forced to spend approximately 45 minutes communicating with the bank to dispute the charges, resulting in the immediate cancellation and reissuance of her debit card. As a direct result of this disruption to her banking access, Plaintiff Reed incurred consequential monetary losses in

---

[48] *Id.*

the form of late fees on essential bills, including a $50.00 late fee for rent, a $20.00 late fee for phone service, and a $15.00 late fee for cable service.

122. In addition to this financial fraud, Plaintiff Reed has experienced further indicators that her Private Information is being trafficked by criminals. Plaintiff Reed received a security alert from Google notifying her that her PII was found on the dark web, as well as an alert from Facebook regarding an unusual login attempt on her social media account. Since the Data Breach, Plaintiff has also observed a noticeable increase in communications indicative of identity theft, receiving at least six unsolicited calls, texts, and emails regarding loans applications, credit inquiries, and applications for medical services. To mitigate the risk of further identity theft, Plaintiff Reed accessed her credit report through Experian to review her accounts for additional fraudulent activity.

123. Plaintiff attributes the actual misuse of her Private Information, including the financial fraud, dark web notifications, security alerts, and fraudulent loan and credit inquiries and applications, directly to the Data Breach as (a) she provided her Private information, including Social Security Number, financial account information, email, and health information to Defendant prior to the Data Breach; (b) Defendant concedes this type of information was part of the Data Breach; (c) she did not have this barrage of fraudulent transactions prior to the Data Breach; and (d) the misuse happened close in time to the unauthorized intrusion, occurring only weeks thereafter and before Defendant had notified her of the breach.

124. Plaintiff Reed provided her Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Reed's

Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

125. Plaintiff Reed reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of Private Information.

126. Plaintiff Reed is very careful about sharing her sensitive PII and PHI. She has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source. She also stores any documents containing her sensitive information in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

127. Plaintiff Reed has made reasonable efforts to mitigate the effect of the Data Breach, including, but not limited to, researching the Data Breach, incurring costs, monitoring her credit information, and changing passwords on her various accounts.

128. Plaintiff Reed has already spent much time monitoring her account to protect herself and will continue to spend significant time and effort monitoring her accounts to protect herself from identity theft.

129. She fears for her personal financial security and worries about what information was exposed in the Data Breach. She knows that cybercriminals are selling her Private Information, and that her PII or PHI could be abused and re-sold months or even years after a data breach. The damage to her identity will only multiply now that Defendant's inadequate security has led to her information being published on the Dark Web by cybercriminals.

130. Plaintiff Reed would not have provided her Private Information to Defendant had she known that Defendant would not take reasonable steps to safeguard it.

131. Because of Defendant's Data Breach, Plaintiff Reed has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, her injuries are precisely the type of injuries that the law contemplates and addresses.

132. Plaintiff Reed suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

133. Plaintiff Reed suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

134. Plaintiff Reed suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Reed's Private Information right in the hands of criminals.

135. Because of the Data Breach, Plaintiff Reed anticipates spending considerable amounts of time and money to try and mitigate her injuries.

136. Today, Plaintiff Reed has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Nathan Custalow-Hall***

137. Plaintiff Custalow-Hall is an adult, who at all relevant times, was a resident and citizen of the State of Ohio.

138. Plaintiff Custalow-Hall received a data breach notice on or about December 4, 2025 informing him that his Private Information provided to RBHA was compromised during the Data Breach.

139. Defendant's notice fails to mention the involvement of the criminal ransomware gang Qilin or that Qilin had already published Plaintiffs' and other Class Members' Private Information on its Dark Web website, making the information accessible to other criminals. In fact – the notice letter states the opposite, indicating Defendant had no indication the Private Information was misused by an unauthorized individual.[49]

140. Plaintiff Custalow-Hall provided Defendant with his sensitive PII and PHI as a condition of receiving Defendant's services. He provided Defendant with his full contact information, Social Security Number, government identification, date of birth, medical history and records, other medical information, financial payment information and health insurance information, as well as any other necessary information required by Defendant to provide treatment.

141. Thus, in order to render services to Plaintiff Custalow-Hall, Defendant obtained and maintained his Private Information prior to the Data Breach. As a result, Plaintiff Custalow-Hall was injured by Defendant's Data Breach and suffered actual misuse of his Private Information because: (i) his Private Information, including his Social Security number, was stolen in the Data Breach; and (ii) Plaintiff Custalow-Hall's Private Information has already been posted on the dark web.

142. Plaintiff Custalow-Hall is especially alarmed by the breadth of information involved in the Data Breach. Defendant's letter acknowledges that information such as full names or first initials and last names combined with your Social Security number, passport number, financial account information or health information" was compromised in the Data Breach.

---

[49] *See* RBHA – Data Security Incident Notice. https://www.rbha.org/resources/docs/Data%20Security%20Website%20Notice.pdf (last visited March 5, 2026).

However, given the other critical information omitted from or misrepresented in the letter, Plaintiff Custalow-Hall has no confidence that the data stolen was limited to the information listed and is confident it may include any information he provided to RHBA.

143. Plaintiff Custalow-Hall provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Custalow-Hall's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

144. Plaintiff Custalow-Hall reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of Private Information.

145. Plaintiff Custalow-Hall is very careful about sharing his sensitive PII and PHI. He has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source. He also stores any documents containing his sensitive information in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

146. Plaintiff Custalow-Hall has made reasonable efforts to mitigate the effect of the Data Breach, including, but not limited to, researching the Data Breach, incurring costs, monitoring his credit information and financial accounts, and changing passwords on his various accounts.

147. Plaintiff Custalow-Hall has already spent much time monitoring his account to protect himself and will continue to spend significant time and effort monitoring his accounts to protect himself from identity theft.

148. He fears for his personal financial security and worries about what information was exposed and stolen in the Data Breach. He knows that cybercriminals have posted his Private Information to the dark web and are selling his Private Information, and that his PII or PHI could be abused and re-sold months or even years later. The damage to his identity will only multiply now that Defendant's inadequate security has led to his Private Information being published on the Dark Web by cybercriminals.

149. Plaintiff Custalow-Hall would not have provided his Private Information to Defendant had he known that Defendant would not take reasonable steps to safeguard it.

150. Because of Defendant's Data Breach, Plaintiff Custalow-Hall has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, his injuries are precisely the type of injuries that the law contemplates and addresses.

151. Plaintiff Custalow-Hall suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy. He has also suffered actual injury from the publication of his Private Information on the dark web.

152. Plaintiff Custalow-Hall suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

153. Plaintiff Custalow-Hall suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Custalow-Hall's Private Information right in the hands of criminals.

154. Because of the Data Breach, Plaintiff Custalow-Hall anticipates spending considerable amounts of time and money to try and mitigate his injuries.

155. Today, Plaintiff Custalow-Hall has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

**PLAINTIFFS AND CLASS MEMBERS SUFFERED DAMAGES**

156. The ramifications of RBHA's failure to keep Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. This is particularly true in this case where: (i) Plaintiffs' and Class Members' Private Information was stolen in the Data Breach; (ii) the Private Information stolen in the Data Breach includes Plaintiffs' and Class Members' Social Security numbers; (iii) Qilin confirmed the theft and posting of Private Information stolen in the Data Breach (including Plaintiffs' and Class Members' Private Information) to the dark web; and (iv) Plaintiffs have already suffered multiple instances of misuse of their Private Information, including identity theft and fraudulent charges to their financial accounts.

157. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct. Further, the value of Plaintiffs' and Class Members' Private Information has been diminished by its exposure in the Data Breach.

158. PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details

have a price range of $50 to $200.[50] "Fullz" packages, which includes "extra information about the legitimate credit card owner in case" the scammer's "bona fides are challenged when they attempt to use the credit card" are also offered on the dark web.[51]

159. Plaintiffs and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their Private Information as a result of the Data Breach. From a recent study, 28% of individuals affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[52] Unfortunately, the negative consequences of the Data Breach have already materialized considering Plaintiffs' and Class Members' Private Information has already been posted on the dark web, and multiple Plaintiffs have experienced actual misuse of their Private Information, including identity theft and fraudulent charges to their financial accounts.

160. Further, Plaintiffs and Class Members have incurred and will incur out of pocket costs for protective measures, such as identity theft protection, credit monitoring, credit report fees, credit freeze fees, and similar costs related to the Data Breach.

161. Besides the monetary damage sustained in the event of identity theft, consumers may have to spend hours trying to resolve identity theft issues. For example, the FTC estimates

---

[50] Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/. (last visited March 5, 2026).

[51] *Id.*

[52] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last accessed March 5, 2026).

that it takes consumers an average of 200 hours of work over approximately six months to recover from identity theft.[53]

162. Plaintiffs and Class Members are also at a continued risk because their information remains in RBHA's systems, which the Data Breach showed are susceptible to compromise and attack and are subject to further attack so long as RBHA fails to take necessary and appropriate security and training measures to protect the Private Information in its possession.

163. Plaintiffs and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their Private Information to strangers.

164. As a result of RBHA's failure to prevent the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer injuries, including out of pocket expenses; loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their valuable Private Information; the imminent and certainly impeding injury flowing from fraud and identity theft posed by their Private Information being disclosed to unauthorized recipients and cybercriminals; damages to and diminution in value of their Private Information; and continued risk to Plaintiffs' and the Class Members' Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as RBHA fails to undertake appropriate and adequate measures to protect the Private Information entrusted to it.

---

[53] Kathryn Parkman, *How to Report identity Theft*, ConsumerAffairs (Feb. 17, 2022), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html (last accessed March 5, 2026).

## CLASS ALLEGATIONS

165. Plaintiffs bring this class action on behalf of themselves and all other individuals who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

166. Plaintiffs seek to represent a class of persons to be defined as follows:

> All individuals in the United States whose Private Information was compromised in the Data Breach (the "Class").

167. Excluded from the Class are RBHA, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

168. This proposed class definition is based on the information available to Plaintiffs at this time. Plaintiffs may modify the class definition in an amended pleading or when they move for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

169. **Numerosity:** Plaintiffs are informed and believe, and thereon allege, that there are at minimum, tens of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes approximately 113,232 individuals.

170. **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendant was negligent in collecting and storing Plaintiffs' and Class Members' Private Information, and breached its duties thereby;

c. Whether Plaintiffs and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

d. Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct.

171. **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. The claims of Plaintiffs and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiffs and members of the Class were all patients of Defendant, and each had their Private Information exposed and/or accessed by an unauthorized third-party.

172. **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiffs and the Class Members are substantially identical as explained above.

173. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class

treatment will create economies of time, effort, and expense, and promote uniform decision-making.

174. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiffs and each member of the Class. If Defendant breached its duty to Plaintiffs and Class Members, then Plaintiffs and each Class member suffered damages by that conduct.

175. **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

176. **Ascertainability:** Members of the Class are ascertainable. Class Membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

177. Plaintiffs re-allege the above allegations as if fully set forth herein.

178. Defendant's patients, including Plaintiffs and Class Members, provided their non-public Private Information to Defendant as a condition of obtaining services from Defendant.

179. All Plaintiffs and the Class Members entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their

information, use their Private Information for employment/business purposes only, and/or not disclose their Private Information to unauthorized third parties.

180. Upon accepting and storing the Private Information of Plaintiffs and Class Members, Defendant undertook and owed a duty to Plaintiffs and Class Members to exercise reasonable care in securing, safeguarding, storing, and protecting the PII and PHI it collected from them as a condition of obtaining services from RBHA from being compromised, lost, stolen, accessed and misused by unauthorized parties. This duty includes, among other things, designing, maintaining, overseeing, and testing Defendant's security systems to ensure that PII and PHI in RBHA's possession was adequately secured and protected.

181. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if their Private Information were wrongfully disclosed.

182. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices on the part of Defendant. Plaintiffs and the Class Members had no ability to protect their Private Information that was in Defendant's possession. As such, a special relationship existed between Defendant and Plaintiffs and the Class.

183. Defendant owed a duty of care to Plaintiffs and Class Members to provide reasonable security, consistent with industry standards, to ensure that its systems and networks adequately protected their Private Information.

184. Defendant had a special relationship with Plaintiffs and Class Members. Plaintiffs and Class Members' willingness to entrust RBHA with their Private Information as a condition of obtaining services was predicated on the understanding that RBHA would take adequate security precautions to protect their PII and PHI.

185. By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

186. Plaintiffs and members of the Class entrusted Defendant with their PII and PHI with the understanding that RBHA would safeguard their information.

187. Defendant's conduct also created a foreseeable risk of harm to Plaintiffs and Class Members by failing to: (1) secure its systems and exercise adequate oversight of its data security protocols; (2) ensure compliance with industry standard data security practices, (3) implement adequate system and event monitoring, and (4) implement the systems, policies, and procedures necessary to prevent the Data Breach.

188. Defendant knew, or should have known of, the risks inherent in collecting and storing PII and PHI, the vulnerabilities of its systems, and the importance of adequate security. Defendant should have been aware of numerous, well-publicized data breaches in the months and years preceding the Data Breach.

189. Defendant breached its common law duty to act with reasonable care in collecting and storing the Private Information of its patients, which exists independently from any contractual obligations between the parties. Specifically, Defendant breached its common law, statutory, and other duties to Plaintiffs and Class Members in numerous ways, including by:

a. failing to adopt reasonable data security measures, practices, and protocols;

b. failing to implement data security systems, practices, and protocols sufficient to protect Plaintiffs' and Class Members' PII and PHI;

c. storing former patients' PII and PHI longer than reasonably necessary;

d. failing to comply with industry-standard data security measures; and

e. failing to timely disclose critical information regarding the nature of the Data Breach.

190. Defendant's failure to implement and maintain adequate data security measures to protect Plaintiffs' and Class Members' Private Information created conditions conducive to a foreseeable, intentional criminal act in the form of the Data Breach. Plaintiffs and Class Members did not contribute to the Data Breach or the subsequent misuse of their Private Information.

191. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

192. By collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

193. Defendant undertook and/or assumed a duty to protect Plaintiffs and Class Members Private Information by voluntarily taking the information subject to its own Privacy policies and other statutory obligations under HIPAA and Virginia law. *See e.g. Va. Code Ann.* 32.1-127.1:03. Defendant manifested this undertaking via its affirmative acts and representations regarding its ability and responsibility to render adequate protection of its patients Private Information. For example, RHBA's notice of Privacy Policies says Private Information will not

be shared for marketing or sale of the Private Information without written permission.[54] The policy is available in both English and Spanish.[55] Notably, Defendant employs a Privacy Officer, giving further credence Defendant undertook and/or assumed a duty to Protect Plaintiffs' and Class Members' Private Information that was provided to it in order to receive healthcare services.

194. Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and Class Members of the Data Breach.

195. Defendant had and continues to have duties to adequately disclose that the Private Information of Plaintiffs and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

196. Defendant has admitted that the Private Information of Plaintiffs and Class Members was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

197. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and Class Members.

198. But for Defendant's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

[54] See https://www.rbha.org/our-resources.aspx : Notice of Privacy Policies – English. (last viewed March 5, 2026).
[55] *Id.*

199. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have and will suffer damages including, but not limited to: (i) the loss of value of their Private Information and loss of opportunity to determine for themselves how their PII and PHI is used; (ii) the publication and/or theft of their PII and PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII and PHI; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII and PHI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as RBHA fails to undertake appropriate and adequate measures to protect it; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised for the rest of their lives.

200. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and Class Members and the harm, or risk of imminent harm, suffered by Plaintiffs and Class Members. The Private Information of Plaintiffs and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

201. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy;

(ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) actual misuse, fraud, identity theft, and other indicia of such including an increase in unwanted calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

202. As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

203. Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

204. Plaintiffs and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

205. Plaintiffs re-allege the above allegations as if fully set forth herein.

206. In connection with obtaining services from Defendant, Plaintiffs and Class Members entered into implied contracts with RBHA.

207. Plaintiffs and Class Members were required to deliver their Private Information to Defendant as part of the process of obtaining services from Defendant.

208. Defendant solicited, offered, and invited Class Members to provide their Private Information in order to obtain services from Defendant. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

209. Defendant accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members.

210. When Plaintiffs and Class Members provided their PII and PHI to RBHA, either directly or indirectly, as a pre-condition for obtaining services, they entered into implied contracts with RBHA.

211. In entering such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and adhered to industry standards. Particularly considering that such were outlined to Plaintiffs and Class Members via Defendant's published Privacy Practices. [56]

212. Pursuant to these implied contracts, in exchange for the consideration and PII and PHI provided by Plaintiffs and Class Members, Defendant agreed to, among other things, and Plaintiffs and Class Members understood that RBHA would: (1) provide products and/or services

[56] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.rbha.org/resources/docs/Notice%20of%20Privacy%20Practices%20booklet%20-%202022%2010%20(1).pdf (last viewed March 5, 2026).

to Plaintiffs and Class Members; (2) implement reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' PII and PHI; and (3) protect Plaintiffs' and Class Members' PII and PHI in compliance with federal and state laws and regulations and industry standards.

213. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

214. Implicit in the agreement between Plaintiffs and Class Members and Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses, and (f) retain the Private Information only under conditions that kept such information secure and confidential.

215. The protection of PII and PHI was a material term of the implied contracts between Plaintiffs and Class Members, on the one hand, and Defendant, on the other hand. Indeed, as set forth herein, Defendant recognized its duty to provide adequate data security and ensure the privacy of its patients' PII and PHI with its practice of providing a privacy policy on its website.

216. Defendant understood the need to protect Private Information and prioritize its data security. However, Defendant failed to meet its obligations.

217. Plaintiffs and Class Members performed their obligations under the implied contract when they provided Defendant with their PII and PHI.

218. Defendant breached its obligations under its implied contracts with Plaintiffs and Class Members in failing to implement and maintain reasonable security measures to protect and secure their PII and PHI, and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Class Members' PII and PHI in a manner that complies with applicable laws, regulations, and industry standards

219. The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

220. A meeting of the minds occurred when Plaintiffs and Class Members agreed to, and did, provide their Private Information to Defendant with the reasonable understanding that their Private Information would be adequately protected from foreseeable threats. This inherent understanding exists independent of any other law or contractual obligation any time that highly sensitive PII is exchanged as a condition of receiving services. It is common sense that but for this implicit and/or explicit agreement, Plaintiffs and Class Members would not have provided their Private Information to Defendant.

221. Based on Defendant's conduct, representations, legal obligations, and acceptance of Plaintiffs' and the Class Members' Private Information, Defendant had an implied duty to safeguard their Private Information through the use of reasonable industry standards. This implied duty was reinforced by Defendant's representations in its Privacy Policy.

222. On information and belief, at all relevant times, Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

223. On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' Private Information would remain protected.

224. Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

225. Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

226. Importantly, Virginia law provides that every contract includes good faith and fair dealing between the parties involved.

227. Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

228. Defendant breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their Private Information, by failing to delete the information of Plaintiffs and the Class once the relationship ended, and by failing to provide accurate notice to them that Private Information was compromised as a result of the Data Breach.

229. Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members and continued acceptance of Private Information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

230. Defendant's breach of its obligations of its implied contracts with Plaintiffs and Class Members directly resulted in the Data Breach and the injuries that Plaintiffs and Class Members have suffered from the Data Breach.

231. Plaintiffs and Class Member suffered by virtue of Defendant's breach of their implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft - risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII and PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII and PHI has been breached; (v) they were deprived of the value of their PII and PHI, for which there is a well-established national and international market; (vi) they have lost time and incurred expenses, and will incur future costs to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) the have overpaid for the services they received without adequate data security.

232. Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

233. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

234. Plaintiffs re-allege the above allegations as if fully set forth herein.

235. This count is plead in the alternative to the breach of implied contract count above.

236. By its wrongful acts and omissions described herein, Defendant has obtained a benefit by unduly taking advantage of Plaintiffs and Class Members.

237. Plaintiffs and Class Members conferred a benefit on Defendant, whereby they provided their Private Information to Defendant to obtain services.

238. Defendant prior to and at the time Plaintiffs and Class Members entrusted it with their PII and PHI, caused Plaintiffs and Class Members to reasonably believe that it would keep that Private Information secure.

239. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

240. Defendant collected, maintained, and stored the Private Information of Plaintiffs and Class Members as part of its business operations and to gain profits. As such, Defendant had direct knowledge of the monetary benefits conferred upon it.

241. The monies Defendant was paid in its ordinary course of business included a premium for Defendant's cybersecurity obligations and were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiffs' and Class Members' Private Information.

242. Defendant, by way of its affirmative actions and omissions, including its knowing violations of its express or implied contracts with the entities that collected Plaintiffs' and the Class Members' Private Information, knowingly and deliberately enriched itself by saving the costs it reasonably and contractually should have expended on reasonable data privacy and security measures to secure Plaintiffs' and Class Members' Private Information.

243. Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to

it. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

244. Defendant failed to disclose facts pertaining to its substandard information systems, or defects and vulnerabilities therein before Plaintiffs and Class Members made their decisions to provide Defendant with their Private Information.

245. Defendant enriched itself by hoarding the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheap, ineffective security measures and diverting those funds to its own personal use. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

246. Defendant failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiffs and Class Members, and as a result, Defendant was overpaid.

247. Under principles of equity and good conscience, Defendant should not be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

248. Plaintiffs and Class Members have no adequate remedy at law.

249. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) actual misuse, fraud, identity theft and other indicia of such, including an increase in

unwanted calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

250. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiffs and Class Members may seek restitution or compensation.

## COUNT IV
## DECLARATORY JUDGMENT
## (On Behalf of Plaintiffs and the Class)

251. Plaintiffs re-allege all preceding allegations above as if fully set forth herein.

252. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

253. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' Private Information and whether RBHA is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII. Plaintiffs alleges that RBHA's data security measures remain inadequate. Furthermore, Plaintiffs continues to suffer injury as a result of the compromise of her PII and remains at imminent risk that further compromises of her PII will occur in the future.

254. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. RBHA owes a legal duty to secure patients' Private Information and to timely notify impacted individuals of a data breach under the common law, HIPAA, and various state statutes; and

b. RBHA continues to breach this legal duty by failing to employ reasonable measures to secure Private Information in its possession.

255. This Court also should issue corresponding prospective injunctive relief requiring RBHA to employ adequate security protocols consistent with law and industry standards to protect Private Information in RBHA's data network.

256. If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at RBHA. The risk of another such breach is real, immediate, and substantial. If another breach at RBHA occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and she will be forced to bring multiple lawsuits to rectify the same conduct.

257. The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to RBHA if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to RBHA of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and RBHA has a pre-existing legal obligation to employ such measures.

258. Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at RBHA, thus

eliminating the additional injuries that would result to Plaintiffs and patients whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. For an Order certifying this action as a class action, appointing Plaintiffs as class representative for the Class, and appointing her counsel to represent the Class;

B. For equitable relief enjoining RBHA from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII and PHI, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C. For equitable relief compelling RBHA to utilize appropriate methods and policies with respect to patient data collection, storage, and safety, and to disclose with specificity the types of PII and PHI compromised as a result of the Data Breach;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of RBHA's wrongful conduct;

E. Ordering RBHA to pay for not less than ten years of credit monitoring services for Plaintiffs and Class Members;

F. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. For an award of punitive damages, as allowable by law;

H. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I. Pre- and post-judgment interest on any amounts awarded; and

J. Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: March 6, 2026

Respectfully submitted,

**WEBSTER BOOK, LLP**

/s/ Steven T. Webster
Steven T. Webster (VSB No. 31975)
2300 Wilson Blvd, Suite 728
Arlington, Virginia 22201
Tel. and Fax: (888) 987-9991
Email: swebster@websterbook.com

**LYNCH CARPENTER, LLP**
Gerald D. Wells, III (*pro hac vice* forthcoming)
Robert J. Gray (*pro hac vice* forthcoming)
1760 Market Street, Suite 600
Philadelphia, PA 19103
T: 267-609-6910
F: 267-609-6955
jerry@lcllp.com

Leigh S. Montgomery(*pro hac vice* forthcoming)
lmontgomery@eksm.com
Service only: service@eksm.com
**ELLZEY KHERKHER SANFORD MONTGOMERY, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931

Ramon Rodriguez, III (VA Bar No. 48721)
Tyler J. Bean (*pro hac vice* forthcoming)
Tanner R. Hilton (*pro hac vice* forthcoming)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
(Tel): 212-532-1091
rrodriguez@sirillp.com

Jason M. Wucetich (*pro hac vice* forthcoming)

**WUCETICH & KOROVILAS LLP**
222 North Sepulveda Boulevard, Suite 2000
El Segundo, CA 90245
Telephone: (310) 335-2001
Facsimile: (310) 364-5201
jason@wukolaw.com

***Attorneys for Plaintiffs and the Proposed Class***

**CERTIFICATE OF SERVICE**

I certify that on March 6, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Steven T. Webster*
Steven T. Webster (VSB No. 31975)
**WEBSTER BOOK LLP**